State v. Worrell.

————◦◦◦————

THE STATE, Respondent, v. WORRELL, Appellant.

1. Where a petition of a defendant in a criminal prosecution for a change of venue sets forth one of the statutory grounds for such change, the order removing the cause will not be rendered null and void by reason of an omission to specify therein the cause of removal.
2. Where a motion for a continuance on the ground of the absence of a material witness is overruled, the Supreme Court will not hold it to be error if it clearly appear that the testimony of the absent witness would not have affected the result.

*Appeal from Franklin Circuit Court.*

It is deemed unnecessary to state the facts more fully than they are set forth in the opinion of the court.

*U. Wright*, for appellant.

I. The Franklin Circuit Court had no jurisdiction of the cause, the order of removal by the Warren Circuit Court being illegal and insufficient to take away the jurisdiction of the latter court.

II. The court erred in forcing defendant to trial. The causes of continuance were sufficient in law to support the motion. This court has always recognized discretion thus unsoundly exercised as error. (1 Mo. 700; 3 Mo. 28; 6 Mo. 444; 8 Mo. 500; 9 Mo. 19; 12 Mo. 492.)

III. There was a variance. If a murder be elevated to murder in the first degree because done in the perpetration of a felony, or in the attempt to perpetrate a felony, then the

14—VOL. XXV.

fact of the felony is a material fact essential to the crime, and on every just and established principle of pleading it should be charged. (3 Mo. 364; 20 Mo. 58; 24 Penn. 389.)

IV. The court erred in refusing the instruction asked by defendant. (Lewis C. L. 405, 431; 4 Hump. 136; Swan v. State; Mitchell v. State, 5 Yerg. 340; Dale v. State, 10 Yerg. 551; Pirtle v. State, 663; Hale v. State, 11 Hump. 154.)

V. The evidence being purely circumstantial was not legally sufficient to establish the crime charged. (Wills on Circ. Ev. 149, rule 4; Burrill on Circ. Ev. 737; 1 Stark. Ev. 511; 25 Miss. 584.)

*C. G. Mauro*, (circuit attorney,) and *J. D. Coalter*, for the State.

RYLAND, Judge, delivered the opinion of the court.

The defendant, Edward D. Worrell, was indicted with William H. Bruff for the murder of Bazil H. Gordon, at the May term of the Circuit Court of Warren county, A. D. 1856. The defendants were arraigned and pleaded "not guilty" to the indictment, and on their petition the venue was changed from the Circuit Court of Warren county to the Circuit Court of Franklin county—the petitioners alleging, in their application for the change, that they believed the inhabitants of the entire judicial circuit (of which Warren county composed a part) are so prejudiced against the defendants that a fair trial can not be had in the same. At the September term of the Franklin Circuit Court, A. D. 1856, the case was called and the trial was postponed to a special adjourned term of said court, to be held on the 19th day of January, A. D. 1857. At the special adjourned term of said Franklin Circuit Court, held on the 19th day of January, 1857, the parties appeared—the defendants had severed in their trials—and the defendant, Worrell, moved for a continuance of the cause; filed his own and other affidavits in support of his motion, which motion being overruled he saved the point by his bill of exceptions. A trial was then had,

State v. Worrell.

and the defendant was found guilty of murder in the first degree. He moved for a new trial, assigning among other causes that the court had improperly overruled his motion for a continuance. The court overruled the motion for a new trial; the defendant excepted, and saved the point. He also moved in arrest of judgment for the reasons that, 1st, the court had no jurisdiction of the cause; 2d, the indictment was insufficient to sustain judgment; 3d, because the judgment is for the wrong party. This motion being also overruled, he excepted and saved the point by his bill of exceptions. He thereupon prayed for an appeal to this court, which was granted, and the execution of the sentence was ordered to be stayed until the judgment of this court be had in the case.

The counsel for the prisoner relies upon the following points for a reversal of the judgment in this case. 1st. That the Franklin Circuit Court had no jurisdiction of the cause, the order of removal by the Warren Circuit Court being illegal and insufficient to take away the jurisdiction of the latter court. 2d. The court erred in overruling the application for a continuance and in forcing the defendant to trial. 3d. Variance between the murder as charged in the indictment, and the murder (if any) made out in the proof. 4th. The court erred in refusing the instruction asked by defendant. 5th. The evidence, being purely circumstantial, was not *legally* sufficient to establish the crime charged, and that this is a question for this court.

We have carefully examined the questions raised by the several points relied on by the counsel, and will state the result of our conclusions in regard thereto; not in the order as presented by the counsel and here laid down, but nevertheless we shall notice the various propositions in our own way. We begin with the first proposition, the change of venue. By our statute concerning "Practice in Criminal Cases," (art. 5,) the change of venue in such cases is regulated. It may not be improper here to cite several of the sections of this article. "Sec. 15. Whenever any indictment or prose-

cution for a criminal offence shall be pending in any court against the judge thereof, the same shall be removed to the Circuit Court of some county in a different circuit upon the order in writing of the circuit attorney prosecuting for the circuit, or upon the order of any judge of the Supreme Court. Sec. 16. When any indictment or criminal prosecution shall be pending in any circuit court, the same shall be removed by the order of such court, or the judge thereof, to the circuit court of some county in a different circuit, in either of the following cases : 1st, when the judge of the court in which the cause is pending is near of kin to the defendant by blood or marriage ; or, 2d, where the defendant is a slave, and such judge, or a person near of kin to him, is the owner or has any interest in such slave.; or, 3d, where the offence charged is alleged to have been committed against the person or property of such judge, or some person near of kin to him ; or, 4th, where the judge is in anywise interested or prejudiced, or shall have been counsel in the cause. Sec. 17. Any criminal cause pending in any circuit court may be removed by the order of such court, or the judge thereof, to the circuit court of another county in the same circuit, whenever it shall appear in the manner hereinafter provided that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair trial can not be had therein. Sec. 18. Whenever it shall appear in the manner hereinafter provided that the inhabitants of the entire circuit are so prejudiced against the defendant that a fair trial can not be had therein, *the cause shall,* by order of the court or judge, be removed to another circuit, in which such prejudice is not alleged to exist. Sec. 19. Such order of removal, as specified in the two preceding sections, shall be made on the application of the defendant ; or where the defendant is under the age of sixteen, or is a slave, on the application of such slave, or of the owner, &c. Sec. 20. The petition of the appellant for a change of venue shall. set forth the facts, and the truth of the allegations shall be supported by the affidavit of the defendant, or some credible

disinterested person, &c. Sec. 21. Whenever it shall be within the knowledge of a court or judge that facts exist which would entitle a defendant to the removal of any criminal cause on his application, such court or judge may make an order for such removal, without any application by the party for that purpose. Sec. 22. Every order for the removal of any cause, under the foregoing provisions, shall state whether the same is made on the application of the party, or on facts within the knowledge of the court or judge, and shall specify the cause of removal, and designate the county to which the cause is removed." "Sec. 25. Every order for the removal of a cause, if made in term, shall be entered on the minutes; if made by an officer out of court, shall be in writing, and signed by such officer, and shall be filed by the clerk with the petition (if any) as a part of the record in the cause." "Sec. 31. Whenever any order shall be made for the removal of any cause, under the foregoing provisions, the clerk of the court in which the same is pending shall make out a full transcript of the record and proceedings in the cause, including the order of removal, the petition therefor (if any), and the recognizance of the defendant, and of all witnesses, and shall transmit the same, duly certified under the seal of the court, to the clerk of the court to which the removal is ordered. Sec. 32. On the receipt of such transcript by the clerk of the court to which any cause is removed, he shall file the same as a record of his court, and the same proceedings shall be had in the cause in such court in the same manner and in all respects as if the same had originated therein."

The record before us shows the following petition filed by the defendants for a change of venue :

"State of Missouri v. Edward D. Worrell and Willam H. Bruff. Indictment for murder. Warren Circuit Court — Spring term, 1856. Edward D. Worrell and William H. Bruff upon their oaths state, that they believe the inhabitants of this entire judicial circuit are so prejudiced against the defendants that a fair trial can not be had in the same ;

therefore defendants ask for a change of venue to some other circuit. [Signed] Edward D. Worrell, William H. Bruff." Subscribed and sworn to before me, this 6th day of May, 1856. [Signed] James L. Simms, Justice of the Peace."

Now under the 18th, 19th and 20th sections above recited the Circuit Court of Warren county was bound to change the venue; it had no discretion about the matter. The law pointed out the mode in which it should appear that the inhabitants of the entire judicial circuit were so prejudiced against the defendants that a fair trial could not be had therein. It was by the petition of the defendants, under their oath, setting forth the facts and the allegations. Here we see that all that was necessary under the act in regard to the petition was done. The record then shows the following entry : " State of Missouri vs. Edward D. Worrell and William H. Bruff. Indictment for murder. Now here said defendants file their petition for a change of venue in this cause, which is granted. It is therefore ordered by the court that the venue of this cause be changed to the county of Franklin in this state, and that the clerk of this county make out a full transcript of the record and proceedings in this cause, including this order, and transmit the same duly certified, together with the original papers filed and now forming a part of the record, to the clerk of the Circuit Court of said county of Franklin." The order omits to specify the cause of removal as mentioned in the 22d section. This omission the counsel for the prisoner contends is fatal; that the order changing the venue, without specifying the cause of removal, is so fatally defective as to be incapable of transferring the jurisdiction from the Circuit Court of Warren county to the Circuit Court of Franklin county, and hence the Circuit Court of Franklin county had no authority to proceed to judgment against the prisoner. We do not concur with the counsel in these views. Where the change of venue is upon the application of the party defendant himself, the cause will always appear upon the record. The petition and order of removal are parts of the record, made so by statute, and be-

come incorporated into the record whenever filed in the court to which the removal is made; and in all such cases there is no need to specify in the order the cause of removal. The court, in which the petition for the change of venue is filed setting forth under oath the facts which by law warrant the change, is bound to make the order removing the cause; it has no discretion; it can not refuse to make the order. It is the petition of the defendant stating the causes for which he prays a change of venue under the law, verified by his own affidavit, which requires the order of removal to be made by the court, and which becomes emphatically the cause of such removal. But in causes in which a change of venue is ordered and made by the court of its own motion, or by the judge of the court in vacation, or by the circuit attorney, or a judge of the Supreme Court, then the record should show by the order of removal itself the cause why it is made. There is no petition in such cases setting forth facts under oath; nothing appears then why the order of removal should be made—why a change of venue should be directed. Hence the law required the order in such cases to specify the cause of removal. The record must show that the change of venue has been properly made; and whenever it is made on the petition of the defendant it will, as a matter of course, show the cause of its being made; and there can be no necessity of again specifying the cause in the order of removal. The act permits changes of venue to be made upon the knowledge of facts resting in the mind of the judge alone, to be made without the application of the defendant; nay, to be made against his will. Now, to prevent an improper exercise of this power, the court or judge, ordering a change of venue from facts cognizant to such court or judge, must specify the cause of such removal in the order making it; for unless the cause of the order be thus specified, it may not appear. But when the petition sets forth the cause, and the order follows granting the prayer of the petitioner, there can be no reason why the cause should be again specified in the order. It is not necessary in such cases, and the statute

will not be construed to require a useless repetition of the cause. We therefore construe the act to mean that when the court or judge makes the order of removal from the knowledge of facts in the mind of the court or judge himself, then it is necessary to set forth the cause of such change of venue in the order ; but when made on the petition of the defendant himself, the cause will sufficiently appear in the petition. This court will judicially take notice that Warren county is in the third judicial circuit of this state, and that Franklin county is not. In this case then the order of change is in accordance with the law arising on the facts set forth in the petition, and the cause of such change sufficiently appears on the record. Franklin Circuit Court therefore had jurisdiction of the cause, and had the lawful authority to proceed to judgment therein. This point is therefore ruled against the prisoner.

We will next notice the point in respect to the variance between the murder as charged in the indictment and the proof given in evidence. The indictment charges that the prisoners feloniously, wilfully, deliberately, premeditatedly and of their malice aforethought did make an assault on Gordon, and that Worrell, with a pistol, did feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, shoot Gordon in the back part of the head. The indictment is a formal and correct one under our statute for murder ; that is, it charges the murder to have been done *wilfully, deliberately and premeditatedly*. It describes the wound, and avers the instrument with which the murder was perpetrated, and the manner of its perpetration. It is a good indictment for murder in the first degree. The proof was sufficient to support the charge as will hereafter be seen. But as by the proof the motive for the deed plainly appears to have been for the purpose of robbing the deceased, the counsel for the prisoner contends that as the robbery was the principal matter, and the act of killing but the incident, the indictment should have alleged that the murder was committed in the perpetration or attempt to perpetrate the robbery. Now it is

State v. Worrell.

most obvious, from the facts in proof, that the murder was the initiatory step. To take from the deceased what money and property were in his possession was the mainspring to action, and to murder him first, in order to take with more safety, was the method deliberately resolved upon. Hence the testimony shows that the deceased was shot in the head, the missile of death entering the back part of the skull and ranging front towards the right eye. Hence the remark of the prisoner Worrell "that Gordon did not suffer." "I can assure you, sir, he did not suffer." Well might he come to that conclusion. His victim was deprived of life in the twinkling of an eye, without a thought of being robbed or of any impending evil. His pockets were turned inside out. His watch, his gloves, his horse, saddle-bags, saddle and bridle were taken by the prisoner. The taking in this case was from the dead body; the murder was committed first. It was properly charged in the indictment, and the proof satisfied the jury of the prisoner's guilt. There is in fact then no variance. This point must also be ruled against the prisoner.

In order to a proper understanding of the fourth point on the part of the defence, we shall be compelled to notice the testimony on behalf of the State, and also that for the prisoner. When this is carefully examined, the remaining points, the second and the fifth, will be easily disposed of.

The testimony of Robert Walker is as follows: I knew Gordon for near twenty years; the most of that time he has been with me. I am chief engineer of the Missouri railroad. Early in January, 1856, Mr. Sturgeon and myself started along the road, and he being my assistant I directed him to accompany us; the weather was cold. I purchased a pair of gloves of the description I now use. I directed Mr. Gordon to purchase a pair like them, which he did, as I saw them on his hands on the evening of Sunday, 13th January, 1856. We left for St. Charles, Mr. Sturgeon and myself in the cars, and Mr. Gordon on horseback. We staid at St. Charles at the house of E. L. Wentze. Next morning we started—Mr.

Pratt and Mr. Wentze and a negro boy with us. We reached Bourbonton, Wentze leaving us on·his return. In passing Mexico Mr. Sherbath, another division engineer, joined us and accompanied us to Bourbonton—a daguerrean lending us a buggy—the snow at that time failing us—being in a sleigh. We had our daguerreotype taken in a group, two copies being taken by way of compensation. It was then arranged that Mr. Gordon should, on his return, get one of them and take it to Wentze's office at St. Charles. We passed along the line at the intersection of Hannibal and St. Joseph road, and returning came to Huntsville, in Randolph county, on the evening of the 20th. On Monday afternoon we left Huntsville—Mr. Gordon to go alone direct to St. Louis, and Mr. Sturgeon, myself and Mr. Pratte to go to Jefferson city. After staying at Jefferson a day or so we left for St. Louis, and reached St. Louis on the 26th. On my arrival I found to my surprise that Mr. Gordon had not then reached the city. I expected him to have on the day before. After several days, he not arriving, I became uneasy, and on the 4th of February I met McDonald and inquired if he had seen Gordon. He seemed surprised ; he told me he had not seen Mr. Gordon. I then left on next morning to go and look for Gordon, and directed McDonald to go up to where he understood Gordon had been seen, and come down to meet me, as I went up. On my arrival at St. Charles, I took Mr. Pratte along with me, and started up the Boonslick road, making inquiries, without hearing of Gordon, until at or near the place where we found afterwards the body of Gordon. We met McDonald and Wentze, and received such information as satisfied me that, if murdered, the place where he was killed was between Hutchinson's and St. Charles. We returned that night to Kenner's, and on next morning Wentze went down the road, but could hear nothing; we then all started west to search between —— and Hutchinson's. We inquired at the houses as we went along, but could hear nothing until we reached Stevenson's. He then told me that a saddle had been found. I saw the saddle at the house of Mrs. Steven-

son, which was a dragoon service saddle, and went out to the spot where it was said it had been found, about a half mile south of the road. The thicket is a pin oak thicket, very dense, and comes up to the road from the south, becoming narrow as it came up to the road. We hunted this thicket without success, and on regaining the main road by riding up on the eastern side of the thicket, just as we entered the road, and in the hollow at the point of the thicket a negro man called my attention to some discolored snow which his dog had turned up. I left to get assistance, leaving Pratte and others to search for the body. When I returned, the body had been found, which I recognized to be the body of Bazil Gordon. The body was then lying in the hollow with face up. The snow had been removed from the face; about thirty feet from the travelled track; the snow which the dog had pulled up was red. Neither the gloves, the cap, nor the fur cuffs, were found on him. The overcoat was open except perhaps the two top buttons, and the pocket of his dress pulled inside out. I was shown a pin, which was said to have been found on the body, and which I recognized to be his. The body was stiff and cold. After Capt. Cozens had arrested Mr. Worrell, and had returned, he showed me a watch—this watch (producing it)—which I recognized to be Mr. Gordon's. I have no doubt of its being Mr. Gordon's. When I first got the watch, I found a paper in the watch, concealed, which has on it the name of his father and mother. I knew them to be the names of his father and mother. Before Worrell was arrested, I went to Vincennes and saw a horse in possession of Mr. Gould, a saddle and bridle, which I believe to be Mr. Gordon's. I knew the horse well; he had a small round lump on the lower part of the jaw, just where the curb would cross it, and about the size of a walnut. While we were at Huntsville, Mr. Gordon purchased a pair of saddle-bags, and I was afterwards shown a pair in possession of Mr. Wentze which looked like the same.

Warren V. Stewart, being duly sworn, stated: He lives in Warrenton, and lived there eighteen years; knew Gordon;

on the 24th day of January, 1856, in the evening, saw Mr. Gordon in Warrenton sitting on horseback near Sanders' tavern door; there was a gentleman also on horseback, about forty feet from Gordon. There was another, whom I spoke to and now know to be William Bruff; they all rode off together. I knew Gordon's horse; had attended to the shoeing him while Gordon was on his way up. (William Bruff being produced, the witness stated that he was the same man he spoke to on the occasion.) They all rode off together, the three together going down the Boonslick road towards St. Charles. I helped to take the snow off Gordon's body, about six miles east of Warrenton, in a gully at the edge of the Hickory Grove prairie. The first place west is Mrs. Stevenson's; next west, a German, whose name I do not know; and the next is Ordelheite's. The then used road ran close to the edge of the thicket. The feet of the body were lying east, and his head was twisted out of a straight line of his body, and rather tucked under; saw the body stripped. There was a large hole in the back part of the head and on a line with upper edge of the ear. I did not see whether the ball had come through the head. There was a considerable crowd about it. The wound was from a half inch to five-eighths wide. The body was discovered just before I reached the ground. There was considerable blood in the road or travelled track, from twenty-five to thirty-five feet from where the body was found. The body was found on the 6th of February. There had been several snows, at least two, from that time to the evening Gordon passed through Warrenton. The gully was eighteen to thirty inches deep. The body was entirely covered with snow. I think a person would not be likely to discover the body lying in the gully, riding along the travelled track. There was brush thrown over the body. The gully ran very near in a line parallel with the road, and a person at a considerable distance from the place on the road would be most likely to see the body in the gully. Gordon's horse was a chestnut sorrel, ball-faced horse, lengthy, and of good appearance. I think there must have fallen since the

blood was deposited six or seven inches of snow before the body was found. I would have looked in the thicket for the body. The Boonslick road is more travelled than any other road in the state.

Henry Ordelheite's testimony. I reside in Warren, six miles east from Warrenton, on St. Charles road; was present when the body of Gordon was found. It was lying in a ditch in the old road, made by the wash of the road. We searched through the thicket. The snow about two feet deep; could discover nothing there. We examined the gully and found the body. There was three or four feet of snow over the body. Davis took a hoe to clear out the ditch, and passed over the body without discovering any thing, there being some brush sticking out of the snow, and we concluded to take out the brush, and then found the body. Mrs. Stevenson had had some wood cut close by, and the limbs left were thrown in over Gordon. There was but little snow under the body. The body lay on the back, one arm under it. The face looked as if it had been stamped by a foot, and the nose turned to one side of the face. Stewart came soon after we discovered the body. The body was about twelve or thirteen steps from the spot where the blood was found. The ditch was in some places two and a half feet wide, and others seven feet wide. The body was found about one mile east of my house, and about twenty-five feet north of the travelled track.

James Ferguson's testimony. I reside in Montgomery county, Mo., about thirteen miles east of Danville, on Boonslick road. Mr. Gordon, Mr. Worrell and Bruff were at my house. I had been boarding one of the engineers. Gordon had stopped and stayed all night with me on his way up. They rode up, and Gordon spoke to me, but did not get down while we were talking. I bought a pony of Mr. Worrell, and he rode inside the yard to receive his pay; it was a sorrel mare. I bought the mare of Worrell as he went down the road on the 24th January, 1856. I asked him where he was going. "To Clark county, Kentucky," and had been to Kansas. He stated his name was May. A man came and claim-

ed the horse; described him so well that I gave him up. I afterwards saw Worrell in jail. He knew me. I asked him if he did not think he ought to pay me my money back; he said he did not have any money, but would make it right. I told him the man had described him so well that I was satisfied he was his horse, and gave him up. He said he would make arrangements to make it right. I asked him if he did not think he ought to pay me my money back. He then asked me if it looked reasonable he should pay me when he understood I was going to do all I could against him. I answered, " I have not said so." At the time I purchased the pony saw no symptoms of insanity; neither in jail. I took him to be a very shrewd man. He made the trade without getting off his horse; the time may have been a little more than fifteen minutes; part of this time was taken up in going into my house to get my money. I had no suspicions of insanity, and did not notice him with that view; did not speak excitedly or loud, only when he halloed back to ask what I would give for the pony. I saw no excitement.

Wilson Hutchinson states he resides about four miles east of Warrenton, on Boonslick road; am a farmer and keep private entertainment; have lived in Warren about twenty-six years. In January, 1856, on 24th of month, Gordon, Worrell and Bruff came to my house; stopped and staid all night. The prisoners at the bar are the same men. They stopped and staid all night, and left next morning between seven and eight o'clock. They started down the road east. While there, and during the night, Worrell took out a pistol and loaded it. I saw Gordon's body after it was found, about two and a half miles east of my house. On the night Gordon and the others came to my house the ground was covered with snow, and on the morning it was snowing and very cold. When I first saw the body the snow was raked off the face, lying in the gully. When they left, Gordon went out last. The body was more than one and a half feet deep under the snow. I had passed the road many times from the time Gordon left until his body was discovered; never saw

the body from the road; never suspected any thing. Worrell loaded his pistol shortly after coming into the house. It was a large pistol; the barrel seven or eight inches long. I saw Worrell in St. Louis jail about the 26th of March last; I readily recognized him as the same man; he also recognized me. When I went in the jail I was accompanied by two friends. Worrell was in the hall; the two men who accompanied me went before me. So soon as he saw me he walked up, extended his hand and asked me, " How do you do, sir ?" did not speak to the other two. I then asked him if he knew me; he replied, " Do you know me, sir ?" I told him I had seen him before. He then asked to be taken back to his cell. I went to Bruff's cell and recognized William Bruff. When I left Bruff's cell the jailor told me Mr. Worrell wanted to see me. When I went to his cell Mr. Worrell said, " You look fine and healthy." He then asked me if my family were all well. I told him my family were all well. He then said, " I suppose the roads are pretty good." I told him they were very good. I asked him, " How far did you go the day you left my house?" He replied he went to St. Charles. I then said, " I suppose you did not call on those men you said you were going to call on—Dr. McIllheney and Dr. Watkins ?" He answered, " No." Before they started Worrell had asked me if I knew of a good house about thirty miles where they could stop. I told him Dr. McIllheney's was just thirty miles from my house, and was a good house. He then wanted to know if there was a good place half way where they could get dinner. I told them Dr. Mathews was a good place, just fifteen miles. It is thirty-six miles from my house to St. Charles.· They all agreed to take dinner at Watkins', and stay all night at McIllheney's. Worrell took down the names on paper. The body lay in the gully; his head to the west, in a sort of twisted position; the body lay in the gully two or three hours after I came, until the coroner came; he was then taken out; his body laid on a wagon body turned uppermost; he had on an overcoat and fur collar around and on his breast, and leggins. There was a

large hole in the back of the head—a round hole, which I ran my finger in; saw a Doctor Briscoe, a young man, run a stick in about four inches. His nose was twisted to one side. The body was covered with snow and brush; the gully was not deep; the way the body lay in the gully, any one going east could have seen the body, if one was looking, and there was no brush over it and no snow. I had however travelled the road several times and did not see it.

Clay Taylor states that Doctor Briscoe, jr., is now attending lectures in St. Louis at this time; am acquainted with prisoner; reside in Warren county, and on the 25th was on my way to Warren county from St. Louis; on the Boonslick road met Mr. Worrell about fifteen miles east of the place where the body was found, about noon. Mr. Worrell was riding a chestnut sorrel horse, as I believe. Bruff was with him, leading a brown horse and riding one of the same. Col. White, who was with me, called my attention to Worrell's horse, and remarked, "There was a d——d fine poor man's horse." The horse was a fine looking horse. . When I saw Worrell in jail on the night he was brought to St. Louis, I asked him, if he recognized me. He looked at me closely and replied, " I think I do," and dropped his head. I asked him if he would state when he had seen me. He said he was not certain whether it was at Warrenton or on the road this side. I then asked him if he recollected the circumstance of meeting three buggies together on the day of the unfortunate occurrence. He said he thought he did recollect it. Mr. Sturgeon, the president of the road, was with me, and asked Mr. Worrell, " Please. state, as I am much concerned about my friend, whether he suffered or not." He·replied, standing before us, " He did not suffer," and dropped his head. The answer I shall never forget. Sturgeon seemed a good deal affected. Several days afterwards I again went into jail, saw Worrell; asked him how he was. He replied, " Tolerably well;" seemed low spirited. I then asked him if Gordon had suffered much after he was shot; that Mr. Gordon was a co-laborer of mine on road, and a friend. He replied, " I can

assure you, sir, he did not suffer." I then left him. Soon after the body was found I marked the place; had been searching for him. I took down the testimony for the coroner at request. I examined the body particularly; found a hole at the bottom of the skull, behind and rather to the left. I whittled down a stick to probe the wound. Young Doctor Briscoe probed the wound, and after he was done, I probed it, and state that it was from four to five inches deep, ranging from the left side of the back part of the head to right eye; have frequently seen-gun shot wounds; was in the campaign of 1846, in Weightman's artillery; saw many gun-shot wounds at that time, before and since; would think the wound from three-eighths to half inch wide, and would think was made by a cavalry pistol; have seen gun-shot wounds made with a cavalry pistol, with a conic ball, and believe this wound was made with such a pistol.

Martin McMahon states that he saw Worrell at Christian Way's, in St. Charles city. Way keeps a tavern or boarding-house. There was another man with him, the same I saw with him at Warrenton. Mr. Bruff being produced, he stated he is the same man I saw with Worrell at Way's. They staid all night at Way's; had three horses with them; left next morning; on next morning I proposed to buy one of the horses—Bruff's—a bay horse. About this time a negro came across the street, and asked Mr. Worrell if he had bought that horse, the chestnut sorrel, from Mr. Gordon. He replied, "no;" that he had brought down the horse from up the country. [Cross-examined]. Worrell and Bruff got their supper at the usual supper time. After Worrell had finished his supper he went into the kitchen and bar-room, being same room, and sat by the stove; the kitchen is the sitting room and not the cook room. They went to bed between nine and ten o'clock; did not sleep in same room with them; saw them again next morning when they came to breakfast; a quarter or a half an hour after breakfast I proposed to buy one of the horses. Worrell and Bruff were sitting on horseback watering their horses at the pump; Bruff

was leading one of the horses. The negro that spoke to Worrell about the horse belonged to Mr. Wentze. I am a road hand; have worked on road more than three years; the conversation was at the pump, on the street, in front of the tavern; the boarders were all gone; Way's tavern is on Main street; they left and went to the ferry-landing and crossed on the ice; was at Warrenton when Worrell and Bruff were carried up; went in obedience to a subpœna. At the time they were at Way's, they both had whiskers and mustaches; saw Worrell last September court. The horse which Wentze's negro spoke to Worrell about was a sorrel horse; the boy was the same boy who went up the line with Sturgeon, Gordon and Walker. Way's hotel was two blocks above Mrs. Eckert's.

Hartwell Richards states: I kept a tavern in St. Louis, near the corner of Broadway and Mullanphy streets. About the 26th of January, 1856, between eleven and twelve o'clock of Saturday, prisoner and William H. Bruff came to my house and put up, and left next day at the same time. He was accompanied by William Bruff. The prisoner at the bar and Mr. Bruff—who was produced in court—are the same. They went by the names of Charles Strong and John Ross— William, I think, taking the name of Charles Strong. I asked them their names, and a young man I had in the house wrote them in a book. They had three horses—one a chestnut sorrel horse, of good appearance, and had a knot under his jaw — the others were bays. They left in the morning, saying they were going across the river. Worrell was jovial and agreeable; started with some of the boarders, saying they were going to the theater; they came between eleven and twelve o'clock, the usual time of breaking up the theater. [Cross-examined.] I then kept public house on Broadway; never saw Worrell before he came to my house on 26th. I asked each man his name, and they gave them as above. There was nothing peculiar in their appearance. I held no considerable connected conversation with them; think he had two watches. I am sure he had one. He

wore it conspicuously. Broadway, down which they started, is one of the most public streets in St. Louis. Worrell had a good deal of hair on his face; saw him in jail after he was brought back; spoke to him; recognized him, and at first he did not recognize me, but did afterwards when I called his attention, by asking him if he knew where he staid on Broadway when he went through. I would not be certain of his having more than one watch, but I think he had two; he did not seem anxious not to be seen.

" S. H. Gould states: I reside in Vincennes, Indiana, one hundred and fifty miles from St. Louis; saw Worrell every day from the 2d to 6th of February; Bruff not so long; they had three horses—one a dark sorrel, one a dark bay, and the other a light bay; the sorrel horse was of fine appearance; had a lump under his jaw, about where the curb chain would touch; showed the horse to Morgan, who is here; Signer was with him; I purchased chestnut sorrel horse, saddle and bridle from Worrell; the other horses were also sold—the chestnut sorrel and a bay by Worrell, and another bay horse by Bruff; showed the saddle and bridle I bought with horse to Signer; the other horses were also sold in Vincennes; Worrell left on the train going east to Terre-Haute and Indianapolis; I have sold the chestnut sorrel horse; Worrell sold two of the horses and Bruff one; they were much jaded; the chestnut sorrel horse was bought by me for sixty-five dollars; Worrell went by the name of E. C. Worrell at Vincennes; he entered it on the register in that way; they had two saddles; the saddle I bought of Worrell was a black saddle, with raised skirts, and top of pommel the blacking rubbed off; he wore a pair of military pants, black coat, a black cap, and a pair of gloves similar to the pair now in possession of Maj. Walker; he had several rings and a watch with a common cord guard; I think he sold to my father a small prismatic white seal, hung to the watch by a strip of gold. [Cross-examined.] Myself and father were keeping public hotel in Vincennes; Worrell left at six o'clock in the evening of 6th; the day they arrived at my house was Satur-

day, and Worrell left on Wednesday; did not conceal himself while at Vincennes; in point of fact he was a very conspicuous man; the gloves he brought to my house he traded to my father; saw him pull out his watch once; he registered his own name; Vincennes has a population of four thousand, and he went about town and made some acquaintances. I next saw him in St. Louis jail; I recognized him and he recognized me, and called me by name before I had fairly seen his face; shook hands with me; saw him but once in jail; I next saw him when I went up in company to Warrenton; Mr. Worrell told me he was going to Georgia; going east first, then around to Georgia; some time during his stay he told me this; there was a gentleman and two ladies who were detained at my house during this time; heard him say he had found an old acquaintance—a Mr. Harold—in Vincennes; my house was more patronized than any other in the city. He also had a pair of military spurs; think he had a pair of saddle-bags; he sold the horse to my father on Tuesday, saying his partner had gone off with all his money and he was compelled to sell his horse to pay his bill; he sold both horses on that day; saw nothing in his conduct peculiar or strange; seemed to be disposed to make himself agreeable to every man he met.

Isaac B. Morgan states: I was in Vincennes on the 15th February last; I went in pursuit of my horse; saw S. H. Gould; he told me had bought a horse, and to go to the stable and pick him out; saw a sorrel horse, the same I let Mr. Gordon have on the 13th January; I also found a saddle and bridle which I put on the horse when he was lent to Mr. Gordon when he went up the line of N. M. railroad; am sure the horse was mine; a chestnut sorrel horse, fifteen and a half hands high, a small star in his forehead, and some white on his nose; had a small wen on the under part of the jaw, and some white hairs on the root of his tail; the last witness is the same man who showed me the horse at Vincennes; the saddle belonged to Mr. Signer; I once rode the saddle carrying some tools carried on the pommel; the

tools wore off the enamel blacking of leather, and I took blue ink and put on it, which left a blue spot; the bridle was Signer's, and I borrowed it; had a gag bit which I took off, my horse not going well with it, and put on an old snaffle bit; the bridle was otherwise a very fine one. Signer was with me at Vincennes, and knows the horse, saddle and bridle.

George H. Signer. I know the horse and saddle used by Gordon on January last; was a chestnut sorrel horse, and a black English tree saddle; I loaned it to Gordon to go up the road; saw the same saddle in Vincennes in possession of Mr. Gould; the same day Mr. Worrell's father came to St. Louis; I was more certain about the bridle. Saw the horse also in Mr. Gould's possession, and am confident it was the same horse Morgan lent to Gordon. [Cross-examined.] The reins of the bridle were of fine web, and a yellow brow band, with an old snaffle bit, the gag bit first used being taken off.

Erasmus E. L. Wentze states: I saw prisoner first in Dover, Delaware; saw him first 20th February, 1856; met him in the street; next morning, about two o'clock, A. M., saw him again; he came to the track of a railroad in company with Capt. Cozens, where I was standing near a hand car; we all got on the hand car — Cozens, myself, Worrell, with two others; Cozens put a pair of handcuffs on Worrell at this point; Capt. Cozens gave me a watch which I immediately recognized as the same Mr. Gordon wore; I had had it in my hands several times, and compared watches with him at my house in St. Charles; Gordon had staid at my house twelve nights at least, and I have been much with him on the line of road; Gordon was principal assistant engineer, and I was division engineer; I reported to Gordon; I told Capt. Cozens I knew it to be Gordon's watch; we left Dover on the hand car, and went—I think the name of the town was Smyrna; we stopped there in a small depôt building to wait for the train; while there, the watch was again mentioned; I again told Cozens, in presence of Worrell, that I was still convinced it was Gordon's watch; that I knew it to be his; Worrell

then replied, " Gentlemen, that was Mr. Gordon's watch ;" I had a pair of saddle-bags on my knee, which Capt. Cozens handed to me on coming to the hand car in Dover, and he (Worrell) further, in continuation of his last remark, said, " and those saddle-bags are also Mr. Gordon's ;" I found the paper in the watch spoken of by Maj. Walker on our journey somewhere between that place and St. Louis ; did not know it was there before ; I went with Sturgeon, Gordon, Walker and others along the line of road, to a point twelve miles above Mexico ; a negro boy accompanied us, which I had in my possession ; the party was Sturgeon, Gordon, Walker, myself, Pratte and the negro boy George ; had no other negro boy in my employment ; the boy George took care of the horses on the trip up ; the boy returned with me to Warrenton, and when we reached there, I sent him home ahead ; the boy must have been in St. Charles on the 25th and 26th of January ; my residence was on Main street, in St. Charles ; my house stands on the north-east corner of two streets, and Christian Way's stood on south-east corner, about one hundred feet off; Worrell, when I saw him first in Dover, had whiskers from two to four days' old ; his face had been shaved entirely clean ; the boy George was at home on the 23d day of January ; I was there and saw ; don't know that he was out of town again until about 1st February ; Gordon, on the trip up, rode a horse belonging to J. H. Morgan.

Capt. Cozens states : I reside in St. Louis ; was captain of police for a good many years ; saw Worrell first in Dover, Delaware, in a tavern ; Mr. Worrell came along with me and others to railroad depôt, in Dover ; found the watch produced (being same spoken of by witnesses) in a vest pocket hanging up in a room where Worrell was sleeping ; the watch was taken out of pocket by some gentlemen with me ; we went down to Wentze at hand car, and I took the watch from the gentleman and handed it to Wentze, who was at the car ; we got on the car and went down about twelve or more miles to a little town called Smyrna ; went into the depôt ; I asked Wentze what time it was ; he handed the watch to

State v. Worrell.

me and said, " you had better wind it up, and keep my own time ;" I asked Mr. Worrell whose watch it was, and he said it belonged to Mr. Gordon ; when we got near home, between Alton and St. Louis, Wentze asked to see the watch again, and opened it, and took out the paper produced ; the paper had endorsed the names of William and Agnes Gordon.    We laid over one day at Terre-Haute on our return, being Sunday ; the watch had a chain which was hooked into a buttonhole of the vest when taken from Worrell ; I also found a pair of saddle-bags and trunk in Worrell's room which I brought along with me ; Mr. Worrell also said the saddlebags were Gordon's ; the trunk I gave up to Mr. Worrell or his friends, every thing which is not brought ; the trunk was not a very old trunk ; got to Dover, I think, Thursday evening ; Worrell was arrested that night, between twelve and two o'clock ; did not see him before I arrested him ; I went into his room with two others and took him out of bed.

The defendants gave evidence as follows :

Marcus Wright : I have resided in St. Louis for about five or six weeks to-day ; knew the prisoner Worrell in Portsmouth, Ohio ; became first acquainted in the summer of 1849 or 1850 ; he was then residing there, engaged in the employment of Wm. Eldon, a dry goods merchant ; don't remember he did any thing else in particular ; never knew any thing which would be considered wrong of him ; I believe, so far as I know, he was well liked ; was a member of a Baptist church at that place, and a teacher in a Sabbath school of that church ; knew him from May until October or November of that year ; I left before he did ; never saw any thing of him but what was perfectly sane ; seemed to conduct Sabbath school in an orderly manner ; never knew of his having convulsive fits while there ; I knew he was sick of a fever ; do not know the character of fever ; saw him while sick ; saw nothing but that at times he was fretful ; was quite intimate with him ; don't know where he went from that place, or how long he staid there ; the next Sabbath after I arrived in St. Louis, five or six weeks ago, saw him in

the jail; recognized him; he also recognized me without my mentioning my name; seemed very much pleased; so much that he called to his father, "here is Mr. Wright;" knew his father; he boarded at same house in Portsmouth part of the time; was not so much acquainted with his mother, but saw her several times, and have had conversation with her. I went to see Worrell to see if he was the same person I was acquainted with. The population of Portsmouth was at that time between three and four thousand. I think he was generally known. [Cross-examined.] I never heard him spoken of only as a fine young man; don't think I ever saw any symptoms of insanity about him; staid at the jail from twenty minutes to one-half an hour.

James F. McGee: I reside at present in St. Louis, and since last September; before that time in Baltimore city; know the prisoner; first saw him at Vincennes last winter at railroad depôt; next time in cars; I stopped in Vincennes from Tuesday until Wednesday evening; my wife in company; was then going to Baltimore; Mr. Worrell, understanding I was going to Baltimore, introduced himself to me; he told me that he understood I was going to Baltimore; he asked me whether I was going by way of Cincinnati or by Pittsburgh; I told him I had taken ticket up by way of Crestline and Pittsburgh; he then said he had calculated on going by way of Cincinnati; he asked me if that was the most direct route; I told him I judged so from their selling through tickets; he said if that was so he would alter his course and go with me, as he was going to Baltimore; this was in the depôt office and during the time we were waiting for evening train; the train did not go up until the afternoon of next day; returned to the Harrison house and staid all night; he was dressed in a brown cloth cap, a dark overcoat, and dark colored pants; he had also a black close frock coat; he had a vest chain of a watch and several rings on his fingers; he had mustache and whiskers of the goatee style, very long—unusually long. We waited at depôt on Tuesday evening until nine or ten o'clock, waiting for the evening

train, but it not coming, returned to Harrison house and remained all night. Worrell left the depôt before I did; did not see him again that night; I think he said he put up at the American hotel. The next day I again saw him at depôt; we waited there until the train came in from Terre-Haute; the cars left in the evening for Indianapolis and remained there all night; myself and wife and Mr. Worrell got into the cars and left for Indianapolis; Worrell was dressed the same as the day before; he told me he had been to a ball in Vincennes; did not see Worrell at any other place than at the depôt; while in Vincennes he brought on the cars as baggage a pair of saddle-bags, and placed them in a seat, the same as usual with others; Worrell put up at the same house in Indianapolis that I did—was a public house opposite the depôt; we started the next morning from Indianapolis; he had on a different pair of pantaloons this morning—a pair of blue military pantaloons; we next stopped at Crestline, in Ohio; staid all night; again we stopped at same hotel, and on next morning started for Pittsburgh, keeping saddle-bags in cars with him; stopped in Pittsburgh until nine or ten o'clock at the night of same day; at Pittsburgh, on Saturday afternoon, I remarked that as we would reach Baltimore by next stage that I would go and get shaved; he said he believed he would do the same; that he was getting on into the neighborhood of his friends, he thought it would make him look a little more respectable; we went into the barbershop under the house where we were stopping, and I got shaved; he got his mustache shaved off, leaving his goatee untouched; after he got up I told him if I had not seen him sit down there I should not have recognized him; the change had made him look five years younger; he then spoke to one of the gentlemen who had been travelling with and having conversation with myself and Worrell, and the gentleman replied, "You have the advantage of me, I don't know you." Worrell told him who he was, and further stated that he had just taken off his mustache; the man recognized him then; we stopped at the Monongahela house; when I told him

about changing my apparel, we both went to the store, and I
purchased two white shirts, and he one colored one; next
morning we started for Baltimore by the way of Harrisburgh,
as I had got tickets in St. Louis which took me by that route;
married my wife in Philadelphia; we reached Baltimore on
Sunday evening; I went to a private house—Mrs. Gibson's—
and Worrell went to a private boarding-house—Mrs. Elsy's,
on Second street, where he told me he had formerly boarded;
he told me before he started there where he was going, and
directed the omnibus driver to let him out there; myself and
wife were in same omnibus; the omnibus stopped at the
place, and he got out and requested me to call and see him
that night, while I would be up town; I did not go to see
him until next morning; met him on Baltimore street, in
front of Brook's clothing store; was with him ten or fifteen
minutes talking with him; I introduced Mr. Phelps, my com-
panion, to him by the name of Mr. Worrell; we told him we
were going to take a glass of ale, and requested him to go
with us; he declined to do so; never saw him drink any on
the whole trip except a glass of ale in Pittsburgh; he then
had on dark pants and a dark coat, and still wore a cap, the
same cap or one like it; did not see him again in Baltimore;
we parted and requested me to meet him at Fountain Inn that
night; this hotel is a public place, and as much patronized as
any in the city; the next place I saw him was in Dover; Mr.
Cozens and Harold, of Vincennes, and myself went from
Baltimore by way of Chestertown to Dover; he told me that
he was going to remain in Baltimore a few days; that he had
some friends he was going to visit in Kent county; this was
told while travelling in cars; I arrived in Baltimore on Sun-
day morning, and started with Cozens and Harold to Dover
on Friday following; we went first to Philadelphia—Harold
and myself and Capt. Mitchell, of Baltimore; left Cozens at
Philadelphia and went first to Elkton, thence to Chester-
town, and returned again to Elkton; while at Philadelphia
I first saw Wentze, and he accompanied us from Elkton; it
was the understanding that we should rejoin Cozens at Elk-

ton, and if not at Elkton at Wilmington ; we then all went from Elkton to Wilmington, and thence to Dover ; Harold and Wentze took a private conveyance and went across the country to Dover.    The first time I saw Worrell was when he was in the custody of the officers going down to the hand car ; was not present at the arrest of Worrell ; was not in house ; I thought Worrell, while I was with him, acted very strangely ; I thought so at the time, and so expressed myself ; he made himself generally conspicuous on the whole route ; would go up and speak to any person ; sit down by their side, hold conversation without introduction ; this he did with gentlemen and ladies both ; had not at this time heard any thing about the death of Gordon ; first learned at Baltimore that Worrell was pursued ; don't know where Worrell went to from Baltimore ; I parted with Worrell, Cozens and others on their return at Wilmington—myself returning to Baltimore and they going to Philadelphia ; between Smyrna and Wilmington I went into the car Worrell was in ; I told him I was very sorry to see him in custody on the charge made against him ; he said it was a pretty serious charge, but that he was going back with them quietly and thought he could clear himself of it ; I told him he should not think hard of me for being instrumental in his arrest ; that I thought it was my duty to give all the information concerning him after I had heard the report of the officers ; he replied, " no, not at all ; it was all right."    Cozens was sitting by the side of Worrell at the time ; I asked him to let me have some conversation with him, and he got up and gave me his seat ; Mr. Wentze was in the same car, and I think Harold also ; Mr. Harold and myself remained at Dover the night of the arrest, and next morning took the regular train and overtook them at Smyrna, and Worrell, Cozens and the others got into the cars ; saw him · no more until I came to St. Louis last September, the day before the September term of this court last ; I saw him in the jail at St. Louis ; did not see Bruff in Vincennes ; saw him first in St. Louis, at the time spoken of, in the jail ; I thought his appearance and general conduct

strange along the road—speaking to males and females, and making himself known, telling where he was going. My wife is now in Baltimore ; when Worrell commenced talking with me at Smyrna, he first said it was a pretty bad affair ; I am now engaged in Summer's trunk manufactory in St. Louis ; the period of my engagement expires in the spring.

Otis M. Messick states : I belong to the army, and my head-quarters is Fort Leavenworth ; am now in the recruiting service, and since 25th October under orders of Lieutenant Church ; my grade is that of corporal ; have been in the army two years next July ; part of that time and last fall a year ago was out on the plains ; last April was ordered to Kansas and during intervening winter was at Fort ; have some slight acquaintance with Worrell ; know him by sight ; my company is "C," Captain Thomas J. Wood ; Worrell belonged to "H" Company, Captain Newby ; the prisoner was orderly sergeant of Newby's company ; during the winter of 1855 and 1856, I think ten companies, comprising a full regiment, were there ; saw Worrell while on the plains ; knew who he was ; also at the fort after our return ; there are generally two companies put in same building ; Company B and Company H occupied the same building, but not same rooms ; Worrell, so far as I heard of him, was a man of good standing and character, or he could not hold the position he did ; he deserted the fort during the winter spoken of ; became corporal in April last ; was at first a private ; I stood sentinel a great many times during the winter spoken of ; at one time while on post, and had orders to permit no one to pass without the countersign, and after the signal was given for lights to be blown out in quarters and go to bed ; I had a loaded cavalry carbine and a sabre. Worrell came towards my post ; I hailed him by demanding "who comes there ?" he answered, " a friend ;" I replied, " halt, friend ;" he continued to advance on me, and said, " good evening, sentinel." I took the responsibility on myself not to shoot him, as I did not wish to do so ; was not reported ; it was my duty, after commanding him to halt, to fire on him ; this was my orders ; was not in-

timate with him; knew him as a sergeant of a company in same squadron; don't think he knew me by name; a lieutenant, a sergeant and two corporals, with the sentinels, make up the machinery of the guard; the next morning after he had deserted, it was known he was gone; his hat was found on the ice, and it was suggested by some that he was drowned; don't remember that I ever messed with him; when I first went to the fort, companies C and H were not full, and Worrell had charge of them; never saw him under any epileptic fits; at one time he was absent three or four days from his company, but don't know the cause. I reached the fort in September, 1855; the weather was cold at the time Worrell approached my post; snow on the ground and the river frozen; did not know Bruff. [Cross-examined.] When Worrell first left, the impression was, until he was seen, that he was drowned, as his hat was found on the ice near a hole where we had been getting water; it is very common, where a sentinel is acquainted with another soldier, to let him pass, but I should not feel safe to approach a post unless I knew the sentinel, and that he was posted at that place.

Edward Lane states: I belong to the army of the United States; head-quarters at Fort Leavenworth; am a private, and now on business in the subsistence department; joined the army twelve months prior to last August; enlisted at Columbus, Ohio; have been at Leavenworth, Kearney, Jefferson Barracks and back again to Leavenworth; have been most of time at Leavenworth; belong to first regiment of cavalry, composed of ten companies; know the prisoner; first saw him at Columbus in August, 1855, one or two days; he was then in the army; had just enlisted and was acting as non-commissioned officer; he belonged to Company H, first cavalry, Edw. B. Newby, captain; knew him from that time to January, 1856, when he left Fort Leavenworth; Worrell arrived at Fort Leavenworth about the middle of August, 1855; I was at that time in the same service as now, acting as clerk in the subsistence department; Worrell bore a very good character in the army so far as I ever heard; Worrell

did not drink enough to get intoxicated; don't remember that he was quarrelsome any more than his duty required him to be; he was promoted so soon as he reached Leavenworth, and his appointment dated back to the period of enlistment; observed changes in his deportment several times; he is a person very easy to get under excitement, and when excited, do not believe could control himself; while under excitement he would talk a great deal, and very loud; would use hard and very severe language; and go to him afterwards in ten or fifteen minutes and he would be quite a different man; he had a way considerably different from the general run run of excited men; his eyes would roll and turn round; the reason why he could not control himself is because I don't think any reasonable man would have acted in the way he did; in my opinion, I have seen him perfectly deranged; this was somewhere between the 6th November and 1st December, 1855, as I went to bed at nine o'clock; soon after I went to bed two or three non-commissioned officers came to me and wished me to get up; I got up and went into Worrell's room; when I got into the room I saw Worrell lying on the bed, three or four holding him; every once in a while he called for Lieutenant Clark, and wished him sent for; he lay on the bed, his eyes rolling, and talked about a great many things. We sent for Lieutenant Clark and he came, and thought it was best to send for the doctor; he came in a few minutes; what was given to him, don't know; remained deranged a short time afterwards, how long I can not say; he was held because he was injuring himself, tearing the hair out of his head; was unnaturally strong; I assisted in holding him; did not know me at first; so soon as he could recognize Dr. Kyler he got better; when I first went into room, he did not recognize any one; the officers who came for me to go into room were sergeant Sale and sergeant Short; the others I don't remember; sat up all night with Worrell; saw him deranged a short time afterwards, but paying no particular attention to it can not particularize any incidents; he did no duty for a considerable time after these spells, and had

nothing to excite him ; his health, for all I know to the con-trary, was good ; myself and two or three soldiers and one or two citizens—the latter had been up into the quarters and were coming down the stairs—were standing at the foot of the stairs which led to the orderly's room ; a dispute arose between the citizens and soldiers, but no great noise ; we had not been there many minutes before Worrell opened the orderly sergeant's room door, with a revolver in his hand, cocked and loaded ; he swore he would shoot us ; the first I saw I was standing on the stairs ; looked up ; saw him with the revolver pointed down on us ; appeared wild and greatly excited ; we all, knowing the state of his mind, and how he would be, got out of the way as fast as we could go ; I never saw a man exhibit excitement in the same way in my life ; this last occurrence above detailed was after the time I went to his room as above spoken of ; I don't know as there was any enlargement or expansion of the eye at these times ; I have heard him say that at times he did not know what he did ; this was while we were at the fort ; my memory was better at the time I gave my deposition in regard to what Worrell told me at the fort than now ; it was then fresh in my memory ; and after my deposition was taken, I thought it was all over and would not be again called on to give evidence, and paid no more attention to it. On having had his deposition read to him, the witness further stated that he now recollects that he observed his eyes, on the occasions of his frenzies, were distended and large ; have seen him on parades, at slight and trivial circumstances, work himself into an ungovernable rage ; he would tell me, by way of apology for his rough language, that he could not help it ; he did not know what he did ; he left in early part of January, 1856 ; saw him first in this room last week ; I was sent down to be a witness for the State by order of Gen. P. F. Smith, commander of western division ; Worrell knew me when he saw me ; appeared rather pleased to see me. [Cross-examined.] Stated further that he first knew Worrell in August, 1855 ; am not a particular friend of Worrell ; was intimate with

him, and was not unfriendly ; he drank liquor some three or four days before the occurrence at orderly's room ; he kept liquor in his room ; generally Scheidam schnapps ; and once saw whisky ; have drank with him ; he may have drank and I know nothing about it ; if he had had other liquor in his room I think I would have seen it ; I was often in his room ; did some writing there ; his trunk was open ; there was a desk in the room, and more than one trunk ; never had any business to examine his trunk, except that I have gone to his trunk and taken things out of it and put other things into it, but not often ; could not say how often ; can't swear that he had not any other liquor in his room, but did not see it ; he deserted in the early part of January, 1856 ; the occurrence at foot of stairs of orderly room was between the time of our returning from the plains in early part of November or December ; Lieutenant Clark is now living, keeping hotel in Leavenworth city, and is not now in the army ; don't remember all the persons who were in Worrell's room at the time I went into it ; don't believe it was Sunday, but would not swear positively ; when I mentioned the names of Sale and other non-commissioned officers, I alluded to and intended to be understood as saying that they were in Worrell's room ; don't pretend to say what produced the condition I found Worrell in ; don't swear any thing about it ; at the time spoken of at the foot of the stairs, I did not think it very safe to remain, as he was a very resolute man ; I thought he might shoot ; I don't say that he was deranged on parade, but his conduct was different from other orderlies. The question being asked you by C. Taylor, Richards and Morgan, " if you ever knew Worrell's being crazy," to which you replied, " I did only on one occasion ;" the witness now stated that he said so in his reply, that he saw him crazy on one occasion ; I did not wish to state publicly in that room all that I knew ; I stated to Taylor that at the time it took five or six men to hold him ; Taylor may have asked me further whether it might not have been in liquor ; I was paying no attention to it ; I might have said, I do not know ; I did not think my

words were going to be brought in court; Worrell took off with him a heavy made bay horse, with at least one brand, and there may have been as many as three; the letter was H; it was Worrell's duty as sergeant to detail a man to assist in the stable where these horses were kept; he detailed, on the morning before he left, the man who rode the horse Worrell left with; Worrell left in the evening after this man went to the stable. The man that first was detailed for the stable and during the day was changed to the kitchen, and the man in the kitchen sent to the stable; it was the special duty of Worrell to perform this duty; the commissioned officers had only a supervisory power. A letter of Dr. Worrell, the father of the prisoner, was produced, and witness stated he received a letter from Dr. Worrell, the same, I believe, as the one produced, dated 18th June, 1856; Worrell held position as orderly sergeant in his company—the most important non-commissioned officer of company is clerk to keep the accounts of the company; was acting in that capacity at the time of leaving, and fulfilled its duties except at the time he was sick; was with Worrell on the plains, but not much to do with him. [Cross-examination resumed.] I never saw Worrell the worse for liquor but once, and never that he could not do his duty; and at the time spoken of he in evening called the roll of company and was not observed by his commanding officer; the brand "H" was put on the horse to distinguish the company he belonged to; it was put on his hoof; if there was on the shoulder a brand, it was "H, U S;" some of the horses may not have been branded; the brands on shoulders were generally two and a quarter inches long; on the fore part of shoulder; the saddle would not cover it; I was not requested to stay in room where the questions were asked me by Taylor; I went in of my own accord; this conversation was held with Taylor until after I and the others were sworn and charged by the court not to be in the court-room during examination of witnesses; I told them I would tell the truth as far as I knew it, when I came to testify; Cavendish was clerk of Worrell's

16—VOL. XXV.

company (H) ; H. Clark was the lieutenant of company J, I believe.

Dr. Edward H. Worrell states: He is a teacher, and, in connection with his wife, conducted a female academy, and more recently a male academy ; have been a physician, and am the father of prisoner ; have observed considerable departure from a sound judgment in early life in my son to an extent as to excite apprehensions for the consequence; my wife and myself have frequently talked about it; he has been subject to deliria during his whole life ; this is not insanity, but near of kin to it. In 1854, near Baltimore, my son was with me and my wife visiting a friend—in the evening we were called to tea—in the summer; Edward had been to the city, and just about that time arrived; complained of being weary and tired; he declined to take tea, and sit down to refresh himself; after a while one of his aunts went out to him and came running back with great ———— and stated to his mother that Edward was standing by a tree beating his head against it, and using such actions as indicated that he was crazy; myself and wife, with others, went out and we found him raving and tearing in convulsions ; we took hold of him, Mr. Rose, a strong man, and myself with others ; it took us all to hold him ; Rose thought he was trying to get a knife and was apprehensive ; saw him making indications of getting his knife, but nobody knew for what ; he had a wild stare and seemed like a wild man ; after a while and after a considerable struggle we succeeded in getting him down ; the paroxysm was still on him ; throwing his limbs about him violently, muttering to himself, but don't now remember what ; it may have been muttering noise. We watched him all night, but he was not violent all night; we kept him down, and after a while he fell asleep as if exhausted—in a kind of stupor; a strong impression was made in the family in consequence ; he had been to town that day as usual when he wished ; was temperate ; there was nothing like rum about him ; did not suspect him of any thing of the kind ; had no appearance of having drank any thing. He had not been with

us all the time, as we had sent him to a Quaker's school, kept by a man who we thought would calm him down from that excitability he had exhibited before. At Cumberland, Md., while I was living there, he started with only one or two dollars to go to California; he got to Pittsburgh and wrote me he had got out of money; I sent him means and he came back; afterwards he went to Portsmouth; on one evening at Portsmouth he was brought to my boarding-house in a state very similar to what it had been at Baltimore; his fellow clerk was one of the men who brought him to my room, and he told me that Edward had taken a fit in the counting-house; Watson, the fellow clerk, seemed much scared; the only difference was he was more quiet than formerly; his mind quieted down, and seemed wandering. I then moved in 1851 to Kentucky; saw another spell at Harrison county, Ky.—the same as spoken of by Dr. Curran—in 1851; Dr. Curran and myself consulted on the subject, and were surprised; we talked at first as if he must have been a maniac, but at last concluded it was epilepsy; the weather was of about medium temperature; the doctor was at a loss to account for the attack, and asked me about it; finally concluded it was epilepsy, with more violent symptoms. In July we left Claysville and went to Winchester, Ky.; in August, 1852, I left for Dover; in the winter of 1851 and 1852, he left us at Winchester; while at Winchester we boarded at Lyle's tavern, and Edward stept out with other young men; some young men came to me and told me he was in a very bad way; he had one of those spasms, which was not over when I got there, but was going off; complained of violent head-ache, which was the usual effect of these spasms; while going from Kentucky to Dover, Delaware, we passed through Baltimore; while there, my son stepped up and tapped me on the shoulder; he had been absent about a month; I did not at first recognize him, not expecting to see him there; that night I was sent to see my son at Mrs. Elsy's, where he was boarding; went and called on Dr. Dunbar to go with me; he went; they said he had had a fit, but then he was more

composed, lying on the bed, disposed to sleep ; he prescribed for him valerian and columba and spirits of lavender, perhaps something else ; these are usually given in epileptic fits ; he joined the army in the fall of 1852, to my great annoyance ; did not see him again until 1855, at Wilkesbarre, Pennsylvania, the first part of that year ; I had in the mean time procured Secretary Davis to release him, and he returned home ; he practiced dentistry in office of Dr. Urkart ; we (my son and myself) left that place and reached Chicago July 19th ; we staid there one night ; during that he had no full development of epileptic fits, but was very excitable and fretful—some of the accessaries ; there was no cause which I observed to produce it ; we came to St. Louis and stopped at Mrs. Smith's—Townsley house ; I went to see Mr. Hopkins, the minister ; we staid two or three days ; my son frequently went out ; we left it and went to Louisville ; we parted at Louisville ; Edward went to Cincinnati, and, not getting into business, again joined the army ; never saw him until he came to Dover about a week before his arrest ; myself and wife then lived at Dover ; he put up at a public house in Dover ; he frequently came and took tea or dinner with us at my boarding-house ; my boarding-house is in view of the one he lived in ; we had no suspicion of any thing ; saw nothing unusual ; went about to and fro in the street ; recollects of his having on during the time pataloons of blue color ; Samuel Ringold lived in Baltimore ; knew Blocker in Cumberland, where he was considered a very smart man ; Samuel Ringold once lived in Palmyra, Mo. ; after the arrest of my son, in a few days we followed him to St. Louis ; have seen him constantly in jail since that ; never discovered any thing more than fretfulness and excitability in him, until after September term last ; prior to that time he had had chills, and Dr. Bassett, the jail physician, gave him blue mass, but did not salivate him ; got weak and wanted fresh air, and Dr. Bassett, thinking slightly of his condition, would not give a certificate to jailor for fresh air ; don't remember of any unusual or unnatural appearances ; he had recovered from the

chills before he had fits after September court; the fits became very bad and alarming; I called for Dr. Davis; he would begin before the fits with restlessness and drowsiness and irritability—nothing going right with him—a very peculiar look in the eye—would lose his powers and faint away—his pulse remitting, and some thought was going to die; all of a sudden he would have a most violent spasm; after struggling, would become insensible, his eyes fixed and glazed; would gradually revive—stare wildly—froth in mouth—suppressed respiration; after a while would know those about him; he generally lay down when feeling the attack coming on him; when he would be recovering would fancy things about him which were not in reality; these paroxysms continued up to the time of his leaving for this trial; I prepared myself to render him assistance on the road, if there should be a recurrence of them; but the fresh air revived him; he would have two or three every day, or most every day; from the first attack until we left for Union, Dr. Davis appeared as his physician; during this time I talked to him, but he did not want to come, but afterwards got sick; he was subpœnaed and attached in this cause, but could not attend in consequence of sickness; Dr. Davis had no doubt of his having epilepsy; my son occupied a cell in the upper story; myself or wife have been with him every day since he was first taken; she staid with him in forenoon and I in the afternoon; he was fed part of the time by the jailor, and part by me and my wife; I was not there generally at the ordinary dinner hour. [Cross-examined.] Stated that Robert Raisin married a cousin of my wife. Mrs. Worrell's maiden name was Ringold; Samuel Ringold is a brother to my wife, aged about fifty-six; James Dunn I don't know; Blocher is not related; neither Urghart, Curran; got letters from my son from Leavenworth, but not so often as we thought he ought to have written; he stated at Dover that he deserted the army; I had heard he was dead; Lieutenant Clark wrote to me at about that time that he was dead; he was at home a week or ten days before he was arrested; Dr. Bates told me

after the arrest that he knew of my son's being charged with the murder of Gordon by publication in papers, but concluded it was a mistake. I am now astonished that he should have been able to preserve his equanimity, if guilty; saw nothing.

Elizabeth Worrell states: Her son is twenty-eight years old; was born in Wilmington, Delaware; he first showed early, when four or five years old, irritability and want of self-control—less than in children of that age; was not injured in any way in head by external violence; this irritability and lack of self-control continued to grow with age. In July, 1845, during the day he had the fit, he complained of drowsiness and excitability; after dinner his uncle Robert Tosc asked him to walk in city; I persuaded him to do so, that it might make him feel better; he went and staid till late in afternoon; I was sitting in porch when he returned; I asked him how he felt; he said he felt very bad; he sat there some time; did not seem disposed to talk, but sleepy; he was invited to tea, which he declined; we left him lying on the porch; we remained at tea table some time, and his aunt got up and said she would see if he would not take a cup of tea; she returned in a few moments frightened, and said he was beating his head against a tree; we ran out; saw him rubbing his head against the tree, foaming at the mouth and tearing his hair; I asked him what was the matter; he made no answer, but stared at me as though he did not know me; the gentlemen—Mr. Rose, Waterman and Mr. Worrell—took hold of him; I tried to pacify him; by the time they got him into the house, my sister had a bed put down on parlor floor; I saw him put his hands into his pocket, where he had a large knife; I begged Mr. Rose to get it from him, as he might injure himself; they finally got him on the bed; he struggled and tried to get up; did get up and got to the window and tried to get out; we got him back to bed; his eyes stared wildly about, gritting his teeth, and muttering; after a little while he seemed more composed, and I asked him if he knew me; he made no answer, and did not seem to recognize me;

got some sleep before he recognized any one ; he fell asleep
finally late in night, and we left him with his uncle, Mr.
Rose ; next morning, about eleven o'clock, got up and walked
about as usual ; seemed weak ; after this he would some-
times seem in very good spirits, and at others very much de-
pressed, without any cause observable. The year we were in
Ohio, in 1850, one evening he was brought home by Watson
and others ; he seemed to be affected as he had been pre-
viously in Baltimore ; we got him to bed ; he slept and was
talking wildly in his sleep ; he got up early in the morning
and insisted upon going to the store ; in an hour or two af-
terwards, went to the store in which he was doing business as
clerk ; there was no difference between the attack in Balti-
more and Portsmouth, as far as I saw. At Claysville, Ken-
tucky, on the day in which he had a fit, which was at night,
he was more excited than I had ever seen him, without any
observable cause ; when he was excited before, I had but to
speak to him and lay my hand on his shoulder to quiet him ;
but when I went to him during this day several times and
asked him what was the matter, his eyes looked wild ; was
excited, and walked quick ; he replied, "I don't know,
mother, but I feel very bad ;" he seemed to get more restless
towards night, and, earlier than usual, he said he would go
to bed ; went across the street to Dr. Curran's room, where
he slept ; heard nothing until eight or nine o'clock at night ;
he sent over for his father, saying he was very sick ; his
father went immediately ; in a few minutes they ran over to
tell me he was dying ; I went over and found him in a vio-
lent fit—several trying to hold him ; the fit was more violent
than the first at B. and longer ; foaming very much at the
mouth ; it passed off as the previous ones had done, only he
did not recover quite as soon as the others ; he was in bed
all next day ; seemed despanding and shed tears at times for
several weeks afterwards ; often said he wished he could die ;
that he felt so wretched he did not wish to live ; he was tired
of life. At Winchester, Kentucky, did not see the fit he had
there ; I was aware of it when it occurred, but my son being

in a different part of town, and with other young men, I waited until my husband returned before I would determine whether I would go; saw him next morning, but was more himself than at Claysville, and recovered sooner. The next was in Baltimore; I was not there at the time and did not see; in about a week afterwards saw him; he came to where I was near Chestertown, on eastern shore, at Wm. Worrell's, his uncle; he was more depressed than I ever saw, even more than at Claysville; he would sit without any expression of the eye, say nothing, and notice nothing around him, and sometimes ramble off; he left me soon afterwards—several weeks—and went to Baltimore; he did not tell me when he left that he was going to enlist in the army; did not see him again until he left the army and returned to Wilkesbarre, where I was, in 1855; he seemed to be not so irritable at first, but towards the last grew more so; he remained with us from January, 1855, to July, 1855, early part of the month; I noticed two or three weeks before he left that it was with difficulty he could control himself. On one occasion I was talking with him on some subject and he became excited, and remarked he would not be controlled by any one, being such language as he never used towards me before; his eyes looked wild; talked loud and seemed nervous; that he could not hold himself still; this was a week or two before he left; don't recollect the precise time; he left with his father coming west; saw him no more until he returned to Dover; he seemed to try to control himself, and would fall on his knees and pray the Lord to help him to control himself; this was at Wilkesbarre; I saw it also in St. Louis a great many times; he would often throw his arms around my neck and ask me to forgive him, that he could not control himself; that he would rather die than give me so much trouble. Edward arrived in St. Louis on Monday and I got there on next Sunday, leaving Dover exactly one week from the time he left; I visited him every morning after nine o'clock, and left at 12, $11\frac{1}{2}$ and some times one o'clock; his father was with him in evening; his paroxysms returned on

him in September, after the last court ; he had a great many paroxysms while his father was absent ; he was absent four weeks ; they would come on, preceded with great irritability, but the symptoms were not always the same, as I could perceive ; I have seen him have a great many paroxysms ; he would fall into insensibility and violent convulsions ; throw his hands against the wall ; look at the wall as if he saw something on it, and strike at it ; tear his hair and grit his teeth, and frequently would not become calm until I would give him the medicine prescribed by Dr. Davis, which I could not do until I could get his teeth ; it was an anodyne ; sometimes he would lay as if he could not close his eyes, but composed ; at other times, would seem to be stupid ; and when I did not administer the anodyne, which I sometimes omitted, he would talk—call over the roll of soldiers—call a Lieutenant Clark, and ask if his horse was ready for him to go to Leavenworth city. On one occasion, quite early in the morning, he was standing with his back to the door fanning the bed with a fan ; he was not so well on evening before, and this morning I went rather earlier ; he said nothing until I put my arm around him and asked him, " son, what is the matter ?" he replied, " hush, mother, father is asleep on the bed ;" I tried to compose him and try to get him to sit down ; he did not appear to have been in bed that night from the appearance of the cell ; he always made his own coffee, and I found he had put on his teakettle, but had not lighted the lamp used to heat the water ; some of his friends came to see him that morning, but he did not recognize them ; did not come to himself until the middle of the day ; staid all day with him ; I left him much better ; at dinner time I was making a cup of coffee for him with my back to him ; heard him light a match ; I turned round and saw him put his finger on the burning match until several blisters were burned on him ; showed no sensibility to the pain ; this was while his father was absent from the city, east. I asked Mr. Music to go up and see him before closing the jail ; Music is the turnkey ; and went for Dr. Davis to go and see him ; before this

Dr. Davis had been called in as physician; on this occasion he had no violent convulsions—at least none after I got there—no frothing of the mouth—no clenching his teeth or tearing his hair; gave him nothing that day, as the symptoms seemed to be different; I was afraid, without consulting the doctor; during the period of having these fits he has moments of cheerfulness and depression, without any cause apparent to account for the change; the changes were generally sudden. I saw I think the day before yesterday that he was going to have a fit; he spoke to me, and when I did not answer him immediately, he became very much excited; he spoke excited up in this room to me; there was no paroxysm for a whole week before he left St. Louis to come up to this court; he has had no paroxysm even until now; I know I must have witnessed one hundred of these fits in St. Louis jail—not all violent—some very slight. Dr. Davis was at jail twice after my husband left for the east, and during his absence we generally let him know of any change of symptoms; Dr. Davis had prescribed for him before this, and was to be advised of any change of symptoms; that he could not get in readily, and has much office practice. On one occasion his paroxysms were so violent that I had to get the under turnkey to assist me in holding him; his name was Mike something; never called in any one to see these convulsive fits; but others have seen—the Rev. Mr. Loup for one; never called up the jailor—Music—at any time. My son came last to Dover in January, 1856, on Wednesday night, and left the Thursday morning week; saw him every day in Dover—sometimes at our seminary, and sometimes at our boarding-house; oftener at my boarding-house; he boarded at Steamboat hotel, kept by Mr. Mullen; he was at a musical soirée while he was in Dover; had none of these fits just spoken of while there; showed no depression until the night before he learned he was to be arrested; sat down and held his head down and not disposed to talk; he came to bid us good night as usual; did not before this exhibit any anxiety, restlessness or disquietude; bid us good night; I think it must have

been eleven o'clock at night; he had been out visiting and staid rather longer; he was acquainted with some of the lawyers of that place; don't know that he had seen any of them that evening; it was a very short distance between our boarding-houses; he never was there before; he knew all the gentlemen at house where he boarded; there was a good many there; he has an uncle living near Chestertown; also Raisin, a cozen of mine, and Samuel Ringold, an uncle, in Baltimore; generally wore the coat he has on now; he also had a pair of military pants; a pair of blue color, and another of plaid color. [Cross-examined.] Dr. Davis visited Edward not more than six times; other ladies saw him; two ladies saw him very often and in these fits; I would rather not mention their names, as it would be disagreeable to them; at the time I speak of his fanning the bed, his state of insensibility was longer; he had no symptoms of fits or convulsions before his return from last court; when he was young and showed irritability I would punish him, and at times this would seem to increase his irritability and enrage him more, and my friends would say I was too strict; I would then relax the discipline; he would always think his friends did not like him, when they would exhibit the greatest fondness for him; he had many friends amongst his playmates; the officer in charge of him day before yesterday, when he exhibited irritability, I do not remember; he may not have heard what was said.

Dr. W. W. Bassett, called by the State, states: I am a practioner of medicine; resided for last two years in St. Louis, and before that in Manchester, St. Louis county, for fourteen years; have practiced twenty-one years; have done all the county practice for two years since last October until about two months ago; after that time only in part; it is my duty to attend the sick in jail when informed of a case; the county and state are responsible for my fees, and collected precisely as other costs; I have attended Worrell and given him prescriptions; some five or six months since, more or less, I think before the Warren

Circuit Court, when he was indicted, he appeared to be laboring under a masked form of intermittent fever; complaining of a severe head-ache and some fever; saw nothing like derangement of the mind; noticed no symptoms of insanity; I asked him about his feelings; he answered me readily, promptly and satisfactorily, as much so as usual with patients; I was attending him more or less for two or perhaps three weeks; I mean by a masked form of intermittent fever, where the fever came on periodically and without a chill; he said his head was aching very much; this form of intermittent fever is as common as the chills and fever; the fever did not rise ordinarily to a great height; his father was with him generally; either Mr. Phelps, the jailor, or his father got me to go and see him; I gave him a combination of sulphuric ether and perhaps chloroform, bathing the head; I was not told by any of his having had epileptic fits before that; I had nothing to suppose there was irritation in the brain from any other cause than ordinary chills and fever; in ninety-nine cases out of a hundred there will be pain in the head from chills and fever; the fever intermitted every twenty-four hours; never saw his mother with him in the cell; saw him from six to ten times as a physician; have not visited him since last September term of this court; have seen him since; I was passing the door of his cell; he spoke to me; shook hands with him several times; his cell was on third story of jail; the causes of insanity are various; epileptic fits may be one of the causes of insanity; I don't know it to be; I mean, among other causes of insanity epilepsy is said to be one; I never saw any such case however; there are various forms of insanity from various causes; the kind of insanity produced by epilepsy is said to be imbecility, by which the mental faculties are very much impaired—so say the authors; I mean by imbecility a deterioration of the mental faculties from their original strength; epilepsy will weaken or impair the intellectual faculties; have repeatedly treated cases of epilepsy, both of long and short standing; in the cases I have seen there was no material change in their mental faculties

State v. Worrell.

after paroxysm was over, at least in those where I knew the patient before he was attacked; epilepsy is sometimes caused by a stroke on the head; sometimes by grief, fear, joy, and fright, and all the passions; some say epilepsy, on post mortem examination, leaves traces on the substance of the brain, and some say not; epileptic patients, after paroxysm, if they complain at all, complain of pain in the head; never attended patients in a lunatic asylum. Pennell, Pritchard, Ray, are some of the works I have examined on the subject of insanity. The subject is not within the range of my ordinary practice, and I do not profess to be posted up; it is very difficult often to determine whether a man is sane or insane; I know of no physical symptoms peculiar to insanity; some persons are perfectly sane on all subjects save one, and unless you touch upon that you may not find it out; it would be difficult for me to determine in a case of simulated insanity, or where they make an effort to conceal it. I know of cases reported where patients in lunatic asylums have succeeded in getting out by their artful concealment; insanity is where the person is affected with such an aberration of mind as to induce a change of action from that usual in his normal state, where there is no other known cause or motive for the change.

Dr. Bannister states: Am a physician; reside in St. Louis; am physician of the city hospital; open to all diseases; have some few lunatics; I have had a limited opportunity of observing lunatics; was one year at lunatic hospital in Philadelphia; averaged about one hundred and eighty insane during the year; never saw insanity in the form of wild delirium result from epilepsy — always imbecility; epilepsy, from long continuance, impairs the mind and results in imbecility; in the cases I have seen there is a gradual loss of memory, and powers of reason; the mind becomes weak and sinks into imbecility; it is often congenital, arising from mal-formation of the brain; an idiot is generally known by a want of expression of the eye, the form of the head, and is unable to speak; an imbecile would be readily found out in a few days' company; a man afflicted with imbecility, result-

ing from epilepsy, could not hold any position requiring the exercise of mind, without being detected by those in habit of being with him; I have never seen a case of imbecility resulting from epilepsy under five years; the case I saw produced by epilepsy in five years, the fit returning every other day; I have known of two persons who have had epileptic fits at intervals from early childhood to twenty-five years, of once a month, and never exhibited any indications of loss of mind; I have never known a case of idiotcy result from epilepsy except where there was congenital malformation; the length of time for epilepsy to injuriously affect the mind of a person depends on the violence of the attack as well as upon the strength of the person affected and power of resistance; it would be unsafe to say that epilepsy would produce imbecility at the same time in two persons; the first attack of epilepsy might be mistaken for some other disease, but a series of attacks; never knew epilepsy complicated with irrisistible and insane impulse; this species of insanity is recognized to exist by the learned, and called homicidal mania; never knew an epileptic commit suicide; don't recollect to have seen a case of the kind; don't remember to have seen in the books a case of homicidal mania resulting from epilepsy; have read Tweedy's Cyclopedia of Medicine — Taylor, Beek, Ray, Esqurol—not Mark, nor Wharton & Little; part of the hospital was set apart for lunatics and paupers; attended this hospital as physician; there were five other physicians; there was another lunatic asylum in Philadelphia exclusively dedicated to the insane; don't think epilepsy would be more apt to produce homicidal mania in an excitable temperament; in homicidal mania, beside the want of power over the will, there is also an uncontrollable disposition to attack those most dear to them formerly, and it involves an entire perversion of moral feelings; insanity is often very difficult to determine; it can be detected from the actions of the person affected; utter imbecility or raving mania are the forms of insanity most frequently simulated; never saw a case of feigned monomania or insanity in other forms, but

have read of the latter in the books; have seen insane exercise much scheming ingenuity to their keepers to convince them of their sanity; the power to reason is not incompatible with monomania; in homicidal insanity the patients seem to labor under great distressing thought—a great desire to do something—a sense of responsibility, and will seem to be relieved by committing the act charged against them; he thinks it a duty to kill, and feels no consciousness of wrong—thinks he has done right; it presents many peculiarities of this kind; don't recollect of seeing anywhere that they ever fly to avoid the act, or conceal themselves; they are apt to do the deed at first favorable occasion which presents itself; in homicidal mania, or in monomania, it is often a very difficult question to determine whether such forms of insanity exist in a particular case; there are tests made in the books to detect it; in homicidal insanity the question whether he had the power at the time of controlling his impulse, is a difficult question; the difficulty of determining is also because the homicidal impulse has a great resemblance to crime; thinks there is hallucination in homicidal mania sometimes; also in monomania.  In imbecility there is neither delusion or hallucination.

Beverly H. Robinson: I am an officer in the United States army; first lieutenant; now stationed at Richmond, Va.; saw Worrell at Fort Leavenworth, in April, 1854; I was then stationed there, and until the first July, 1854; I then crossed the plains as far as Fort Union, in New Mexico, with him; have never seen him since; we arrived at Fort Union the last of August; was on duty with him at Fort Leavenworth; I was officer of the day and the defendant corporal of the guard; saw no symptom of derangement or insanity, or derangement of the mind of any kind; did not know or hear of his having any epileptic fits during the time; the duty of the orderly sergeant of a company is to keep the books of the company, make out all the details, call the roll, and is the most important office in the company; it is not possible for an insane man to do the duties of the office.  [Cross-examined.]  I now

remember that on my return from Harney's expedition, in December, 1855, I saw him at Leavenworth; was first sergeant of Company H, first cavalry; I spoke to him and told him I was glad he occupied so important an office in the company; a man who was suspected of any insanity would not be suffered to hold the position he held; the guard is changed every twenty-four hours; there were eight or ten officers who took their turns every day; I should think he would come on duty as corporal of guard every fourth or sixth day; we were travelling near two months from Leavenworth to Fort Union; there were two companies of dragoons and three or four hundred employees; I belonged to Company D, second dragoons; I was not on duty on the route; was a mere traveller to join my company at Fort Union; I returned in about two weeks from Union; don't think I saw Worrell while there; I was not in such position then that if he had been sick it would be reported to me; there were three companies at Leavenworth from April to July — one of them artillery and two dragoons; saw him on my return but once, and for a short time; had but one interview with him, as above detailed; never heard any thing about his character, independent of that of a soldier; a person afflicted with epileptic fits would not likely be retained in office he held; would not be enlisted if it was known; don't know how long he remained at Fort Union; I was messing with the captain of his company while crossing the plains, and it is probable I would have heard of his sickness if he had any.

Charles F. Clark: Resided at Fort Leavenworth; am quarter-master sergeant since May, 1855; joined the army in January, 1848; know Worrell, first in August, 1855, until 6th or 7th January, 1856; he deserted the evening of January 7th—also sergeant Bruff, of another company; two horses were taken at same time; I know that the horse he was riding before was left; he took another fine horse, noted for his appearance; the horse he was in the habit of riding was in poor condition; my duties were to assist the regimental quarter-master; soon after he joined my company he was

made first sergeant; saw him nearly every day when he was on duty; he would be off duty when sick and with leave; would occasionally see him several times a day; had many more official duties with Worrell than any other soldier in the garrison; during the time we received a large amount of military stores, which I assisted to distribute to the companies; Worrell received for his company; never saw him insane; we both left the Fort for Kearney, and from there to Cotton Wood Springs and back to Kearney; we started in September and got back to Leavenworth about 4th November—leaving Worrell at Muddy creek—three days' march from Leavenworth; saw him nearly every day; never during all the time saw Worrell insane; saw him once in liquor between November 6th, 1855, and January 6th, 1856; he was riding horseback, and could not sit in the saddle; kept liquor in his room—at least, have found liquor there several times; there is no regulation in the army against keeping liquor—at least, except in case of drunkenness; Bruff was of Company J, first cavalry, and Worrell and myself of H, of same regiment; it is according to the orders he received whether the sentinel allows any one to pass his post; a soldier of one regiment will allow always another of same regiment to pass his post, if satisfied of his good intentions; Worrell bore a fair character; was the best first sergeant in regiment; this continued till the day he left; an insane man could not have filled his office—the duties were very complicated. [Cross-examined.] Have no reason to doubt his honesty; I have no means of knowing whether he delivered over the arms and stores received; saw him sick once after his return from the plains; was not on any occasion called up to go to his room; never saw him present a loaded pistol at any one to shoot him since I have been in the regiment; I have been out when at Leavenworth frequently every night, and never stopped except when drunk; when I saw him drunk he was with another man, who was also reeling about drunk; I went to Leavenworth in 1855, in June; when I was at Worrell's room we drank together—the liquor was

17—VOL. XXV.

whisky; never drank any brandy in his room; it was in the afternoon that I saw him drunk, about half hour before sunset; it was after stable call to summon the men to the stable to water and to attend to their horses; he came from direction of Leavenworth city, and rode to the rear of the stables; don't know how many times he was sick while we were together at the fort; never saw him but once; I heard he was sick at other times; did not stay but a few minutes; am not certain whether any one was with him; was lying down; looked thin and pale as any other sick man; I was only mustered once in two months.

In vain have we looked through this long detail of evidence for the basis to support the instruction here asked for by the defendant's counsel, which is as follows: "In determining the question whether the defendant was guilty of murder in the first degree, partial insanity, if it appear in evidence, may be properly considered by the jury in determining what was the mental condition of defendant at the time of the homicide; if the jury do not find from the evidence that the defendant was so insane as to be incapable of guilt, as explained in a previous instruction, yet if they shall believe from the evidence that, from previous epileptic fits or other cause, his mind was impaired and clouded, and incapable of deliberately, sedately, forming a fixed and settled specific design to take the life of Gordon, they ought to find him guilty of murder in the second degree." Instructions are given by the court to the jury to assist them in coming to a proper conclusion in their deliberations. The court, retaining a knowledge of the testimony as given, instructs the jury as to the law arising on the facts supposed to be in proof. The court is never required to give abstract propositions of law to the jury. The instructions must have reference to the case. There is nothing preserved in the evidence that could in the slightest degree justify the expectation on the part of the defendant's counsel that this instruction would be given to the jury. There was nothing to warrant it, and the court very properly refused it. In looking over the charge given by the

court to the jury, we feel it our duty to express our dissent from some of the propositions therein laid down in regard to the case in proof before the court. This murder, as made out by the evidence, is most manifestly murder in the first degree. The victim in this case was most foully murdered. There can be no doubt but that he was deliberately shot by one of his companions for what he was supposed to have in his possession. He was shot from behind; was shot in a very short time after commencing the journey in the morning—indicative of the previously formed determination—no doubt, that the idea passed through the mind of the murderer when he loaded his pistol the night before. From the wound on the body—the property taken by the prisoner, even to the gloves—the prisoner's expression, " that the deceased did not suffer"—the whole mass of circumstances leaves no doubt of the deed being done wilfully, deliberately and premeditatedly. Then if Worrell did the deed, he was guilty of murder in the first degree. Now what excuse is offered ? Nothing that would justify a court in calling the attention of the jury to it. The charge given was altogether too favorable to the prisoner; yet it is better to err on the side of the defendant, in favor of life, than against him; and, whatever else may be said in this case, it can not be alleged that the law was too harshly laid down by the court. We consider that the circuit court might properly have refused to give any instruction to the jury in this case upon the subject of insanity. There is scarcely a pretence presented by the record for instruction in regard to the prisoner's being insane. A man filling the office of orderly sergeant to his company, in the service of the United States, in such a manner as to be considered the *best orderly* in the regiment—a station which an insane man could not occupy a week without his insanity being discovered—a man showing himself a smart, keen trader in the sale of his horse a few hours before the fatal deed is perpetrated—exhibiting the usual capacity found among men both before and after the deed; and then to offer as an excuse for his crime the fact that he has been known frequently to get

into a raging passion, and has been afflicted at times with fits of epilepsy! Upon the state of the evidence presented by the record, the circuit court might well have refused to instruct on the subject of insanity. However, that court gave a very lengthy charge on the subject,. and the prisoner had the full benefit of this ground of defence.

As to the evidence not being legally sufficient to warrant the conviction of the prisoner—which is the fifth point made by his counsel in this court—we have only to say, that, from a careful examination of the whole evidence, we can not find any room to doubt the propriety of the verdict. Indeed we are unable to see how the jury could do otherwise than find the prisoner guilty of murder in the first degree. No unprejudiced mind can examine the detail of circumstances produced on the trial below, and preserved in the bill of exceptions, without coming to the conclusion, beyond a doubt, that Gordon was murdered, and that the prisoner was concerned in the murder. The jury were then justified in finding their verdict as they have done in this case. We have now examined the points in the defence, all except the second, and find none of them sufficient to authorize a reversal of the judgment below.

From the affidavit of the defendant Worrell, and the accompanying affidavit in support of his motion for a continuance, there did appear at first some grounds for the motion, and it seemed to us as if the lower court had exercised its discretion to the prejudice of the prisoner; but when we examine the affidavit and find what the prisoner expected to prove by the absent witness Davis, and the absent depositions, and now see the whole case before us, we see that the evidence could not and ought not to have the effect of changing the result of the trial; consequently he was not prejudiced by being ruled into trial. Even if the circuit court may have seemingly exercised its discretion without proper caution at first, (which we do not pretend to say was the case here,) yet when the whole case is presented before this court, and the absent testimony, and the absent witness, from what is alleged

State v. Worrell.

in the affidavit, may be supposed not to be able to change the result, if produced and present, and indeed ought not to change the result, there can be no injury done to the defendant by ruling him to trial; and in such cases this court will not reverse. There is nothing then in the second point. We have now considered very carefully and weighed anxiously every point urged by the defendant's counsel for a reversal of this judgment (and the ingenuity of the counsel has left no point untouched), and we come to the conclusion that the judgment must be affirmed. Judge Scott concurring, the judgment is affirmed; Judge Leonard sick and absent.